Plaintiff was employed by the defendant company in July, 1937, as a lineman, and worked continuously for the defendant until some time in March, 1939, when he became physically unable to continue with his work.
It is admitted that the Compensation Act, Act No. 20 of 1914, applied to plaintiff's employment and that his wages were such that if he is entitled to compensation the rate should be the maximum of $20 per week.
The plaintiff claims that the physical disability which forced him to cease his employment as lineman consisted of injury to his back, in the sacro-iliac region, resulting from a strain sustained by him while stringing cable on a 35-foot pole. He states that he was attached to the pole by means of a safety belt and spikes on his shoes, and that he was using a block and tackle to string the cable, and that upon giving the cable a jerk or pull while in an awkward position he strained his back, and had to come down from the pole, and thereafter never again was able to do that type of work. He states that after this back strain he was assigned to light work which he attempted to perform until about March 21, 1939, at which time he had to stop work entirely. He was paid his wages until that date, and thereafter, for the next 13 weeks, until June 27, 1939, he received his wages plus accident and health benefits of $25 per week. He sues the defendant for workmen's compensation at the rate of $20 per week from June 27, 1939, for a period of 400 weeks, plus $250 for medical expenses.
Judgment was rendered by Judge Herget (who did not hear the evidence) in favor of the defendant, dismissing plaintiff's suit. Plaintiff has appealed.
The plaintiff states that after suffering the back strain while pulling the cable on the thirty-five foot pole, "I gradually worked myself down and I went over to Mr. Birmingham and reported to him. I said I had a crick in my back. He told me to go over to the hospital and he would make out an accident report." The implication of plaintiff's statement is that he told Mr. Birmingham, his foreman at the time, that he had sustained the accident claimed, but Birmingham, who at the time of trial was employed by another company, testified positively that he had never had *Page 906 
any accident report involving injury to plaintiff's back during March, 1939; but that on March 9, 1939, plaintiff had complained of not feeling well and that he had suggested to plaintiff that he go to the company hospital for attention.
None of the other fellow employees of plaintiff — Roberts, Grass, McCann — who were working in the same crew with plaintiff, could corroborate plaintiff's testimony as to an accident, though the witness Roberts did testify that plaintiff complained of a backache either on the day that he went to the hospital or some time thereafter.
Dr. Sanford, the company doctor, testifies that plaintiff reported to the hospital on March 9, 1939, complaining of frequent and painful urination, and thinking that he was suffering from some kidney or bladder disorder he referred him to Dr. LaNasa, a G.U. specialist.
Dr. LaNasa testifies that he examined plaintiff and found that he was suffering from prostatitis and treated him for that trouble. He states that plaintiff complained of pain in his back, and recommended to Dr. Sanford that he be given infra red light applications on his back to eliminate any possible back pain caused by something else than the prostatic trouble. Dr. LaNasa also recommended to Dr. Sanford that plaintiff be given light work.
Dr. Sanford testified further that in accordance with Dr. LaNasa's recommendation, plaintiff was placed on ground duty, and also that he was given two infra red light treatments on the region of his back where he complained of pain; that plaintiff never once complained to him or to his knowledge of any plant accident resulting in injury to his back, and that he never received any accident report in accordance with the custom of the company when employees are treated for accident, and that plaintiff's case was treated as an outside case. He admits, however, that plaintiff never signed and was never asked to sign the customary release absolving the company from any claim for accidental injury, when he ended his employment because of disability.
It is shown, however, that after being on light duty for a few days, forms were prepared by the company employees and signed by plaintiff and his doctor, showing that plaintiff was suffering from disability not connected with his employment for which he was entitled to payments of $25 per week for a period of 13 weeks from The Equitable Life Assurance Society, and that these payments would not have been made if plaintiff's disability had been the result of an accident in the scope of his employment. Counsel for plaintiff contends that since these forms were prepared by company employees, plaintiff did not understand what kind of claim was being made. However, he did sign a statement as follows: "I hereby apply for sickness benefits as an employee of du Pont Co. on account of total disability which is in no way due to or connected with my employment — and which commenced on 3-20-1939." It is hard to believe that the company employees in charge of disability claims would have deceived plaintiff and the insurance company thusly, if plaintiff had ever made a claim of injury by accident on his job.
The doctor who acted for plaintiff with reference to the health benefits was Dr. Herpich, who states that he saw plaintiff in March, 1939, and upon examination concluded that he was suffering from "chronic prostatitis and with what I concluded to be a sub-acute appendicitis." Dr. Herpich testified further that "the history plaintiff offered accounting for his pain was that of pulling a cable over his right shoulder." Apparently, Dr. Herpich did not take that history very seriously, since on March 29, 1939, he certified to The Equitable Life Assurance Society that plaintiff was then suffering and had been suffering since March 20, 1939, with "sub-acute appendicitis."
Harry Downs, called by plaintiff, testified that he roomed with plaintiff during March, 1939, and that he observed that plaintiff walked in a slow, painful manner, and not like a normal man. Counsel for plaintiff tried to get this witness to testify as to any complaint that plaintiff may have made to him about any injury sustained, but objection was made and sustained as to that line of testimony, and counsel for plaintiff in his original brief makes the observation that the lower court erred in sustaining the objection, and that in the event the appellate court does not find that plaintiff has made a case, it should be remanded for this further testimony of witness Downs.
It is shown that on April 19, 1939, plaintiff entered Charity Hospital where he was examined by several doctors, including X-ray and fluoroscopic examinations, with *Page 907 
final diagnosis of his condition as "Peptic Ulcer." The hospital history of his case shows that he was suffering, among other things, from "backache", but there is no showing that he ever gave any history of having had an accident or strain to his back. The three hospital doctors who testified were: Dr. H.D. Ogden, specialist in urology, who made a negative finding in so far as his specialty was concerned; Dr. M.E. Kopfler, Medical Resident at Charity Hospital, whose impression on first examining plaintiff was that he had neurasthenia and chronic prostatitis, but whose final diagnosis was duodenal ulcer; and Dr. J.B. Irwin, specialist in Radiology, whose diagnosis from X-ray and fluoroscopic examinations was also duodenal ulcer.
Dr. W.S. Slaughter testified that he examined plaintiff on August 16, 1939, and again on November 18, 1939, and his diagnosis was "curvature of the spine due to the shortening of the left leg, and this curvature makes his back structurally weak. There are no objective signs of any injury." He testified further that plaintiff has given him some short history of pain in his back, and that plaintiff told him he strained his back at some time. He said that neither the curvature of the spine nor the shortening of the leg was due to trauma at least during the past four or five years. He recommended that plaintiff build up his shoe to compensate for the slight tilting of his spine, which suggestion plaintiff did not follow.
Dr. T. Jeff McHugh and Dr. I. Ashton Robins made a joint clinical and radio-graphic examination of plaintiff on November 16, 1939, and found "nothing diagnostic of injury."
Plaintiff was employed in August and September, 1939, as a line foreman by the construction firm of Sullivan, Long Hagerty, and was discharged, according to the testimony of John R. Lathram, Vice President of that company, and Joe McPoland, Construction Superintendent of that company, because of lack of experience and inefficiency in the type of work involved. Their testimony shows that his work was a ground job, and not of the same character as the job on which he claims to have been injured.
The record contains testimony that plaintiff applied thereafter for employment with Sullivan, Long Hagerty, as well as with The Solvey Process Company, without indicating any disability. Finally, R. O'Brien, Safety Engineer at the du Pont plant, testified that he had custody of the accident slips, and produced all accident slips with reference to Plaintiff Springer, not one of which refers to the alleged accident in March, 1939.
From the foregoing review, it is our conclusion that plaintiff's disability which caused him first to go on light duty, and then to stop work entirely, was not caused, according to the preponderance of the evidence, by any accident as alleged, but by disease unconnected with his employment. His backache seems to be based entirely on subjective symptoms except for the condition of prostatitis found by some of the physicians who examined him, and possibly by the slight curvature of his spine found by Dr. Slaughter. In any event, in view of the fact that his version of the accident is flatly contradicted by his fellow employees, Birmingham, Roberts, McCann and Grass, who were supposed to have been present at the time of the alleged accident, and also by Dr. Sanford, the company physician, and by the fact that no accident report was ever filed, and the further circumstances that he applied for and accepted benefits for disability not connected with his work, it cannot be said that he has proved the alleged accident to a legal certainty. Plaintiff's only proof of the actual accident is his own testimony as to sustaining the back strain on some indefinite date, plus a short history of having sustained such back strain given to two, namely Dr. Slaughter and Dr. Herpich, of the many doctors who examined him; and the testimony of Dr. Slaughter is that he found a slight curvature of the spine unconnected with any recent trauma, and Dr. Herpich found a condition of prostatitis and sub-acute appendicitis. Even admitting that the accident alleged did occur, it is not proved to a legal certainty that plaintiff's disability was the result of the back injury caused by such strain. The preponderance of the evidence is to the effect that plaintiff was disabled by one or more conditions unconnected with his employment — prostatitis, sub-acute appendicitis, slight curvature of the spine, peptic ulcer.
For these reasons, the judgment appealed from is affirmed. *Page 908